UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

|  |  |  |
|---|---|---|
| SCOTT CRIDER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:05-cv-660 |
| | ) | |
| v. | ) | Honorable Joseph G. Scoville |
| | ) | |
| HIGHMARK LIFE INSURANCE CO., | ) | |
| | ) | **OPINION** |
| Defendant. | ) | |
| _____ | ) | |

This is an action for benefits brought pursuant to the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461. This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(a)(1)(B). Plaintiff seeks reinstatement of long-term disability (LTD) benefits under a policy of insurance provided by his former employer, Wickes Lumber Company. The policy was written by Trans-General Life Insurance Company, now known as Highmark Life Insurance Company. The insurance policy (AR 345-367)[1] contains all of the operative provisions regarding payment of LTD benefits and for all intents and purposes is the ERISA plan. Highmark paid LTD benefits under the plan from February 23, 2000, until October 31, 2004, when Broadspire Services, Inc., the third-party claims administrator, found that plaintiff was

---

[1] The administrative record (AR) has been filed by defendants as docket # 15. To put it mildly, the record is a mess. Defendant's method of presentation of the record has been singularly unhelpful to the court, as the documents therein are in no particular order and contain numerous duplicates.

no longer entitled to benefits under the plan.  After Highmark rejected plaintiff's appeal, plaintiff initiated this action on September 26, 2005.

On November 17, 2005, the parties submitted a stipulation and a proposed order (docket # 6) dismissing Broadspire Services, Inc. as a defendant.  The parties also stipulated to dismissal of count II of plaintiff's complaint with prejudice.  On November 17, 2005, Chief Judge Robert Holmes Bell entered an order granting the stipulated motion.  (docket # 8).  Plaintiff's remaining claim is his claim in count I against Highmark pursuant to 29 U.S.C. § 1132(a)(1)(B).

Pursuant to the requirements of the case management order (docket # 13), the parties have now filed the administrative record and their briefs, addressed to the procedural and substantive issues involved in this case.  Under *Wilkins v. Baptist Healthcare Systems, Inc.*, 150 F.3d 609 (6th Cir. 1998), the court's review of plaintiff's claim under ERISA must be based upon the administrative record alone.  The parties have consented to the dispositive jurisdiction of a magistrate judge.  (*See* Consent and Order of Reference, docket # 14).  Upon review of the administrative record, the court finds that the decision to terminate plaintiff's LTD benefits does not withstand *de novo* review.

### Findings of Fact

**A.     The Plan**

1.     The LTD plan was embodied in a policy of group insurance issued by the Trans-General Life Insurance Company, effective October 1, 1995 (AR 345-367) (hereinafter "Group Policy").  The Group Policy covered the officers and employees of Wickes Lumber

Company.  The Group Policy provided for the payment of long-term disability benefits after a 180-day elimination period.  (Group Policy, Part 3, AR 352).

        2.      The Group Policy contains the following provisions relevant to the definition of disability:

> You will be considered **DISABLED** during the Elimination Period if you are Totally Disabled as defined below, and you are not working at all.
>
> You will be considered Disabled during the Maximum Benefit Period if you are either Totally Disabled or Residually Disabled, as defined below:
>
> **TOTALLY DISABLED:**
>
> 1.     You are only required to be Totally Disabled from your own occupation during the Elimination Period and the first 24 months of the Maximum Benefit Period.
>
>        You are Totally Disabled from your own occupation if you are currently unable, as a result of your sickness, accidental bodily injury, or pregnancy, to perform the substantial and material duties of your own occupation, and you are not working at all.
>
> 2.     You must be Totally Disabled from all occupations after the first 24 months of the Maximum Benefit Period.
>
>        You are Totally Disabled from all occupations if you are currently unable, as a result of your sickness, accidental bodily injury, or pregnancy, to perform the substantial and material duties of any occupation for which you are reasonably fitted by education, training, and experience, and you are not working at all.
>
> **RESIDUALLY DISABLED:**
>
> 1.     You are Residually Disabled during the first 24 months of the Maximum Benefit Period if you are currently unable, as a result of your sickness, accidental bodily injury, or pregnancy, to perform the substantial and material duties of your own occupation, and you satisfy one of the following conditions:
>
>       a.     You are working in your own occupation, and you are currently unable, as a result of your sickness, accidental bodily injury, or pregnancy, to earn more than 80% of your Indexed Predisability Earnings.
>
>       b.     You are working in another occupation or specialty, and your actual work earnings do not exceed 80% of your Indexed Predisability Earnings.
>
> 2.     You are Residually Disabled after the first 24 months of the Maximum Benefit Period if you are working in your own occupation or any other occupation or specialty, and you are currently unable, as a result of your sickness, accidental bodily injury, or pregnancy, to earn more than 80% of your Indexed Predisability Earnings from work in that occupation or any other occupation for which you are reasonably fitted by education, training, and experience.

-3-

(Group Policy, Part 5, AR 355-56).

### B.       Plaintiff's Initial Period of Benefits

3.       Plaintiff, Scott Crider, began working for Wickes Lumber Company as a truck driver on May 4, 1998.  One month later, he was promoted to Yard Supervisor, a position he held until August 25, 1999.  On that day, plaintiff suffered a back injury on the job while lifting 100-pound bundles of shingles.  (AR 415).[2]  Plaintiff began to treat with Dr. Roger Holman, D.O., a family practice physician.  An MRI taken shortly after the accident revealed disc material impinging on the L3-L4 nerve root, with spinal canal narrowing at the L4-L5 level arising from the disc bulge and bilateral severe facet disease.  A myelogram taken four months after the accident showed bulging discs at L2-L3, L3-L4, L4-L5, and L5-S1.  In addition, it showed spinal stenosis consistent with disc herniation.  (*Id.*).  Plaintiff applied for LTD benefits under the Group Policy.

4.       During the 180-day elimination period, plaintiff underwent a physical therapy program and treated with Dr. Randy Russo.  He continued to complain of back pain with some radiation into the right leg.  By December 21, 1999, Dr. Russo did not believe that any further aggressive medical evaluation was warranted.  The doctor also concluded that no further diagnostic studies or injection therapy were necessary and that surgery was not indicated.  (AR 416).  The insurance company sent plaintiff for a functional capacity evaluation on December 29, 1999, by Mark DeKraker and Mark Scharich.  The evaluation revealed that plaintiff was performing at a level between sedentary and light physical demands.  (AR 417).  In January 2000, plaintiff saw Dr. Ken

---

[2] The administrative record submitted to the court initially omits a page AR 415 between AR 414 and AR 416.  The page numbering then proceeds up to AR 419 such that AR 415 appears to be missing.  Page AR 415 appears immediately after AR 419.

Eason, who diagnosed mild spinal stenosis and probable irritation of the right side nerve roots.  He suggested epidural injections and physical therapy.  In February 2000, Dr. Stephen Winston administered a transforaminal L5 epidural steroid injection.  (*Id.*).

5.      Trans-General Life Insurance approved plaintiff's claim for LTD benefits and made its first payment as of February 23, 2000, the expiration of the 180-day elimination period. The insurance company paid benefits for twenty-four months, under the provisions of the Group Policy that deemed a beneficiary to be totally disabled if he was unable, as a result of sickness or bodily injury, "to perform the substantial and material duties of your own occupation," the test under the policy for the first twenty-four months of disability.  (Group Policy, Part 5, AR 355).

6.      After certifying plaintiff for LTD benefits, the insurance company required him to submit to physical examinations and employability reviews.  Highmark retained Brian P. Giersch, M.D., a rehabilitation medicine specialist, to perform a medical evaluation.  Dr. Giersch submitted to Highmark a nine-page medical report dated November 9, 2000.  (AR 415-423).  The report indicates that Dr. Giersch reviewed all previous medical and vocational records and conducted a physical examination.  Dr. Giersch diagnosed chronic low back pain, caused by degenerative disc disease with positive discogram at L5-S1, facet hypertrophy and spinal stenosis at the L3-L4 and L4-L5 levels.  (AR 421).  The doctor also noted sleep and mood disturbances and hypertension.  Dr. Giersch identified as the "first option" symptomatic treatment with anti-inflammatories, work restrictions, anti-depressants, intermittent physical therapy and a home exercise program; he identified spinal fusion as "a last resort."  (AR 422).  Dr. Giersch opined as follows concerning plaintiff's employability:

Most importantly, I believe that Mr. Crider is capable of gainful employment. It is also a very important part of his overall rehabilitation reestablishing for him a role and sense of purpose. I have again reviewed his functional capacity evaluations and he is felt to be able to work at the light duty level[3] as defined by the Dictionary of Occupational Titles, U.S. Department of Labor. I would add to this, however, the option to sit/stand every hour as needed.

(AR 423).

      7.     Contemporaneously with the medical examination by Dr. Giersch, the insurance company had plaintiff undergo a functional capacity evaluation at the Healthsouth Sports Medicine and Rehabilitation Center of Paw Paw. The evaluation, conducted by a physical therapist, is summarized in a five-page report. (AR 410-14). The examiner found that plaintiff had deficits in his musculoskeletal system, including antalgic ambulation, impaired posture, decreased flexibility in active of range of motion in the trunk, decreased strength, tenderness, and increased muscle tone of lumbo-sacro paraspinals on each side. Functional testing revealed that plaintiff was capable of

---

[3] Dr. Giersch and the other professionals who examined plaintiff assessed his residual strength by reference to standards published by the Department of Labor. Appendix C in Volume II of the Dictionary of Occupational Titles contains the following definition of light work:

Following are descriptions of the five terms in which the Strength Factor is expressed:

        \* \* \* \*

L- Light Work - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

UNITED STATES DEPARTMENT OF LABOR, EMPLOYMENT & TRAINING ADMIN., II Dictionary of Occupational Titles (DOT), 1013 (4th ed. 1991).

lifting in the light category of work (according to U.S. Department of Labor standards). Although plaintiff was able to reach, kneel, and twist on an occasional basis, he was found to be unable to crawl, squat repetitively or in a sustained fashion, or climb a ladder. (AR 410). The evaluator found that plaintiff was able to tolerate work at the light exertional category for eight hours per day, provided that he was able to make frequent changes in position from sitting to standing and to walking and was given other postural accommodations. (*Id.*).

### C.    Termination and Reinstatement of Benefits

8.    The first twenty-four months of LTD benefits expired in February 2002. Under the Group Policy, after the first twenty-four months of benefits has been paid, the test for total disability changes. During the first twenty-four months, a beneficiary is deemed to be totally disabled if he is currently unable, as a result of sickness or bodily injury, to perform the substantial material duties of his *own* occupation. After the first twenty-four months, the test becomes more difficult to meet, as a beneficiary is totally disabled only if he is unable to perform the substantial and material duties of *any* occupation for which he is reasonably fitted by education, training, and experience. (Group Policy, Part 5, AR 355-56). Highmark, apparently acting on the presumption that plaintiff's condition was not so severe that it disabled him from any occupation, ceased paying benefits as of February 2002. The record, however, does not contain any written notice to plaintiff concerning the cessation of benefits. Plaintiff retained an attorney, Barry Schroder, who apparently protested the cessation of benefits. Again, however, the record does not reflect any formal appeal.

9.    In response to Mr. Schroder's protest, Highmark determined to offer plaintiff a settlement to buy out any remaining obligation under the Group Policy. An internal Highmark

document (AR 72) indicates that management decided to offer a settlement to plaintiff because he had (1) limited skills, (2) a back injury, (3) limited education, (4) was not bondable because of his criminal record, and (5) did not qualify for social security disability because of insufficient quarters of coverage.  On July 18, 2002, Highmark offered plaintiff $40,000.00, but plaintiff demanded $175,000.00.  Settlement discussions then ended.

        10.    As part of its continuing investigation of plaintiff's entitlement to LTD benefits, Highmark placed him under surveillance in July and August of 2002.  Surveillance showed that plaintiff was working at two establishments: The Boat Doctor and Ann's Canvas.  Inquiries disclosed that plaintiff was on probation and that he was required to work at least thirty hours a week as a condition of probation.  (AR 72).  The insurance company conducted further investigation to determine the nature of plaintiff's employment and the wages earned.  Apparently, neither plaintiff nor the employers were very cooperative in the investigation and could not provide documents showing plaintiff's earnings.  (AR 73).  Highmark was able to ascertain, however, that plaintiff was indeed working, but that his wages were minimal and did not meet the 80% threshold under the Group Policy.  Plaintiff would therefore not be disqualified from receiving benefits, as he would be deemed "residually disabled" under the Group Policy.  (AR 356).  Nevertheless, Highmark did not reinstate benefits, believing that the work activities shown on the surveillance tape indicated that plaintiff was not disabled.  (AR 74).

        11.    To pursue this issue, the insurance company arranged a second medical examination by Dr. Giersch, who had examined plaintiff in the year 2000.  Dr. Giersch summarized the findings from his examination in a six-page report dated December 26, 2002.  (AR 177-182).  Plaintiff related to Dr. Giersch that his condition had been gradually been getting worse since the last

examination.  Plaintiff reported that Drs. Winston and Easton had released him from treatment, as there was "nothing else they could do."  Plaintiff continued to see Dr. Holman, who prescribed medications to control plaintiff's pain.  (AR 177).  The report indicated that Dr. Giersch reviewed again all the medical evidence leading up to his 2000 report, as well as new records available from Dr. Holman's office, which indicated that plaintiff was then taking 40 milligrams of OxyContin five times a day.  According to plaintiff, he was then able to carry out basic activities of daily living and spent time visiting friends and family.  He was able to drive, but this was limited by discomfort. Plaintiff reported that he was unable to lift anything.  (AR 179).  On physical examination, Dr. Giersch remarked that plaintiff was 5' 10" tall and weighed 220 pounds, which qualified him as obese.  Spinal flexion was only mildly restricted, with extension moderately to severely restricted with complaints of midline low back discomfort.  In the seated position, plaintiff was negative for pain on the straight leg raising test.  His hips had a full range of motion.  Motor examination revealed good strength through the lower extremities.  The doctor's diagnosis was unchanged from that reached two years earlier.  (AR 180).  Dr. Giersch opined that plaintiff's "subjective complaints are in excess of the objective findings."  He stated that plaintiff's actual abilities and function exceed those that plaintiff claimed.  Dr. Giersch concluded that plaintiff "was able to work at the light duty level as defined by the Dictionary of Occupational Titles, U.S. Department of Labor with a sit/stand option every hour as needed."  (AR 181).

12.     The insurance company also commissioned a "Transferable Skills Analysis - Labor Market Survey" by James Earhart, a vocational counselor.  The results of Mr. Earhart's review are summarized in an eleven-page report dated January 28, 2003.  (AR 183-193).  Mr. Earhart operated on the assumption that plaintiff was able to complete light duty work with a sit/stand option

every hour as needed, in accordance with the medical report issued by Dr. Giersch.  He also noted the restrictions imposed by Dr. Holman, one of plaintiff's treaters.  Mr. Earhart noted under educational history that plaintiff had obtained a GED, but had received no other training.  He listed certain skills that plaintiff had acquired in his previous occupations as truck driver, foreman-dispatcher, receptionist, and canvas laborer, and listed those that should be transferable to other occupations. (AR 183-85).  Mr. Earhart then compared plaintiff's transferable work skills, adjusted for the physical limitations imposed by Drs. Holman and Giersch, to determine whether there were other jobs that plaintiff could perform. By this method, he identified seven general occupations, such as salesperson, motor vehicle dispatcher, and telemarketer, that plaintiff should be able to perform. Mr. Earhart then did a labor market survey, identifying sixteen employers who offered jobs compatible with plaintiff's physical limitations and transferable skills.  Only one of the jobs, however, paid a wage sufficient to meet the 80% test for residual disability under the Policy.

13. On April 2, 2003, Highmark reinstated plaintiff's disability benefits, submitting two checks totaling $22,980.54, covering the months February 2002 through March 2003. The cover letter from Valerie Smith, an employee of Highmark, stated that the insurance company had determined that plaintiff met the definitions for residual disability under the Group Policy. (AR 510).  The insurance company began to make regular monthly payments thereafter.

**D.      Reexamination of Plaintiff and Termination of Benefits by Broadspire**

14. On September 29, 2003, case analyst Valerie Smith of Highmark authored a case status/update memorandum. (AR 72-76).  The memorandum recited the history of plaintiff's disability case, including the unsuccessful efforts to settle with plaintiff, the surveillance of plaintiff

-10-

working at two part-time jobs, and Dr. Giersch's medical review.  With regard to the transferable

skills analysis done by Mr. Earhart, the memorandum noted as follows:

> In February, 2002, we scheduled a LMS.  However because of his limited
> education, lack of transferable skills, extremely high wage test amount and criminal
> record, the LMS was unable to identify jobs which met our financial obligation.

(AR 74).  (The reference to the insurance company's "financial obligation" was to the provisions of

the Group Policy defining residual disability.  Under this provision, a beneficiary is deemed

residually disabled if he is currently unable, as a result of sickness or bodily injury, to earn more than

80% of his indexed predisability earnings.)  Among other action items identified in the

memorandum, Ms. Smith determined that "all efforts should be made to work on a vocational

rehabilitation plan with [plaintiff] so that he can be gainfully employed at some point."  (AR 75).

    15. In October 2003, Highmark notified plaintiff that it had turned over

administration of his LTD claims to Kemper Services, a third-party administrator.  (AR 55).  By

December of the same year, Kemper Services changed its name to Broadspire Services, Inc.  (AR

66).

    16. On March 16, 2004, plaintiff's general practice physician, Dr. Holman,

completed an "Evaluation of Physical Abilities" form.  (AR 624-26).  Dr. Holman's report indicated

that plaintiff was on several medications, including OxyContin (40 mg six times a day), Celebrex,

and Imitrex.  Under the section headed "Objective Data," the doctor noted low back pain, muscle

spasms, and radicular pain to the right leg.  The attending physician's statement indicated that the

doctor was unable to release this patient to work and did not anticipate significant clinical

improvement in the foreseeable future.  (AR 625).  However, on the Evaluation of Physical Abilities

-11-

form, Dr. Holman indicated that plaintiff was able to lift, carry, push and pull at the sedentary level.[4]

The report indicated that plaintiff should never crouch, squat, kneel, or crawl, but indicated that he

was able to perform other activities either occasionally or frequently.  To this extent, Dr. Holman's

evaluation of plaintiff's physical abilities conflicted with his conclusion that plaintiff was unable to

return to any type of work.  (AR 624).

       17.    In March of 2004, Kathleen Gignilliat, a registered nurse employed by

Broadspire as a field care manager, interviewed plaintiff and his wife at a restaurant.  Ms. Gignilliat

prepared a three-page assessment (AR 146-49) in which she observed that plaintiff walked with a

stiff posture, limp, and slow gait as he entered the restaurant.  She also noted that plaintiff changed

his seated position every ten to fifteen minutes and made frequent adjustments.  Plaintiff was unable

to maintain a seated position for the entire assessment and found it necessary to stand for five to ten

minutes two times during the interview.  (AR 146).  Nurse Gignilliat noted the existence of

nonexertional impairments arising from plaintiff's frequent changes in position, but noted that she

did not observe any additional pain behaviors.  She stated that she was unable to assess whether

plaintiff had any work capacity, because she had not reviewed medical records and the observed

limitations and physical ability was "subjective."  (AR 148).  Finally, the nurse noted that plaintiff

---

[4] DOT, Appendix C contains the following definition of sedentary work:

S- Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs may be defined as Sedentary when walking and standing are required only occasionally and all other sedentary criteria are met."

DOT at 1013.

was taking OxyContin six times a day and hydrocodone once a day.  "Both are narcotic analgesics that could affect cognition."  (AR 149).

        18.     In April 2004, Broadspire referred plaintiff to NovaCare Rehabilitation to perform a functional assessment, which occurred on April 16, 2004.  The results of the assessment are summarized in a report.  (AR 199-206).  The examiner concluded that plaintiff was capable of performing work in the light exertional category but identified a number of nonexertional restrictions including the following: plaintiff could sit for twenty-five to thirty minutes at a time, for a total of three hours per day; he could stand for five to fifteen minutes at a time, for a total of one hour; he could occasionally walk short distances, for a total of two to three hours per day.  Plaintiff should never crawl or kneel.  He could only minimally bend or stoop, climb stairs, and crouch and could squat occasionally.  (AR 200).  He was able to lift small weights only occasionally.  Some lifting tests were terminated early because of plaintiff's report of back pain.  (AR 202-03).  The examiner noted that plaintiff demonstrated poor body mechanics during the weighted activities and that his results for weighted activities were below normal when compared with other injured workers with profiles of the same age category, injury area, and gender.  (AR 199).

        19.     Broadspire next sent plaintiff for a vocational assessment conducted by Rene Teper, a vocational care manager.  Mr. Teper summarized the results of his review in a six-page Employability Assessment Report dated June 14, 2004.  (AR 405-09).  The report reflects that Teper reviewed plaintiff's work history and background information provided by plaintiff himself on a questionnaire completed in February 2004.  Teper also reviewed the previous transferable skills analysis (AR 183-193) and interviewed plaintiff.  (AR 405).  As explained by defendant's brief, "Mr. Teper was charged with determining whether there were jobs available which the plaintiff was

-13-

qualified for through his education and prior work history, and that would pay 80 percent of his pre-disability income, $19.83 per hour." (Highmark's Brief, docket # 19, at 6). In performing this assessment, Teper purported to apply the residual functional capacity determined by Dr. Giersch: light work with a sit/stand option every hour as needed. (AR 407). Applying this residual functional capacity to the transferable skills possessed by plaintiff, Teper identified three jobs that plaintiff was purportedly able to perform and which paid an hourly wage in excess of the $19.83 target:

```
Yard Supervisor            929.133-010
Industry: Woodworking
SVP: 7, Strength: Light
SOC: 53-1031, First Line Sprvr/mger of Trans & Mtrl-mvg
Wage: $23.67 hourly

Supervisor, Wood Crew      669.137-010
Industry: Sawmill and Planning Mill
SVP: 6, Strength: Light
SOC: 51-1011, First Line Supervisors/Mgr of Production
Wage: $23.87 hourly

Supervisor, Machining      669-130-022
Industry: Woodworking
SVP: 7, Strength: Light
SOC: 51.1011, First Line Supervisors/Mgr of Production
Wage: $23.87 hourly
```

(AR 408). Teper obtained the wage information from a State of Michigan, Department of Labor, website. Teper concluded, "Mr. Crider is employable per plan requirements." (AR 409).

      20.    On August 24, 2004, Broadspire submitted plaintiff's file to an orthopedic surgeon, Dr. Robert Ennis, for a medical review. His findings are summarized in a three-page report. (AR 440-42). Dr. Ennis did not examine plaintiff or run any tests of his own; his review was limited to medical and vocational documents submitted to him by the insurance company. (AR 440). Dr. Ennis confirmed that the x-rays showed multi-level lumbar spondylosis and degenerative disc

disease, which would justify restrictions preventing plaintiff from prolonged heavy lifting, climbing, or repetitive bending and stooping. (AR 441). He noted that additional medical information would be helpful in evaluating the claimant, identifying a current orthopedic evaluation documenting the claimant's range of motion, muscle strength, presence or absence of spasm, and other tests, and a current radiographic and/or electrodiagnostic test. In the same vein, he remarked that a new medical examination would "in all likelihood be reasonable if there were consideration to alter the claimant's treatment program and/or level of activity." (AR 441-42). Nevertheless, Dr. Ennis concluded that the documentation and medical records did not support a finding of continuing disability or impairment that would preclude plaintiff from working in any occupation. The record does not reflect that any of the diagnostic work identified by Dr. Ennis was performed.

21. On October 19, 2004, Shirley Heera, a disability claims specialist for Broadspire, prepared a letter to plaintiff's counsel announcing the termination of disability benefits as of October 31, 2004. (AR 445-47). The letter was faxed to plaintiff's attorney on October 20, 2004. (AR 26, 444, 451). The termination letter indicated that Broadspire had completed its review of plaintiff's claim and found that he no longer met the definition of disability in the policy. The letter recited the history of examination and evaluations, concluding that plaintiff was able to perform light to sedentary work activity. The letter listed the three jobs identified by Rene Teper in his Employability Assessment Report dated June 14, 2004. With regard to these jobs, the letter recited that the jobs "are available within your geographic area, and are in keeping with the transferable skills and physical abilities as outlined by Functional Capacity Evaluation, the salary required by your policy and the information provided by your provider." (AR 447). The letter concluded with an advice of plaintiff's appeal rights, which among other things, directed plaintiff

-15-

to submit a "written letter of appeal to Broadspire Services, Inc." and address the appeal to Broadspire's Appeal Department at a Plantation, Florida post office box address.  (*Id.*).

### E.     Appeal and Subsequent Medical Reviews

22.     On December 7, 2004, plaintiff's wife wrote a letter on his behalf (AR 515-17), which Broadspire accepted as an appeal.  (AR 35-37).  On the same day, Dr. Holman submitted a physician's examination statement (AR 505-08).  Dr. Holman's report reflected that plaintiff was severely limited by degenerative changes in the lumbar spine producing stiffness of the low back, and numbness radiating to the right leg.  It imposed severe lifting restrictions, and Dr. Holman remarked that plaintiff was unable to sit in one position for a prolonged period of time.  He indicated that plaintiff should never bend, twist, squat, kneel, climb ladders, crouch, crawl or stoop.  (AR 519).  Plaintiff was to avoid unprotected heights, vibration, and working outside in cold weather.  Plaintiff had a moderate restriction for work near moving machinery and in temperature extremes.  (AR 520).  Attached to the physician's statement was an MRI report (AR 509) showing bulging of the disc at L2-L3, L3-L4, L4-L5, and L5-S1.  No focal disc herniation or central spinal stenosis was identified, and the nerve roots appeared to exit freely.  "There has been no significant change in the appearance of the lumbar spine since the prior study of 09/05/99." (AR 509).  On December 14, 2004, plaintiff's attorney mailed a copy of a physical work performance evaluation by a physical therapist at Northern Physical Therapy.  Plaintiff had been unable to complete testing secondary to pain levels and muscle spasms in his lower back.  (AR 571-73).

23.     On January 31, 2005, plaintiff submitted a report from his pain management physician, Stephen L. Winston, M.D.  (AR 600-03).  The report indicated that plaintiff had referred

himself to the doctor for pain management evaluation, and that the doctor had not seen him for approximately four years. (AR 600). The report detailed plaintiff's past medical history. It reflected his use of OxyContin (80 mg, three times a day), Celebrex (200 mg, twice a day), Paxil (25 mg, four times a day), and Imitrex (as needed). Dr. Winston performed a thorough physical examination, which showed some tenderness at the lumbosacral junction but no significant sciatic notch tenderness. Range of motion showed flexion to approximately 45 degrees with increasing pain, pain with deflexion, and increasing pain with all motion . Straight leg raising was positive on the right side for back pain and negative on the left. The report also noted that plaintiff was legally blind in his left eye. Dr. Winston noted that he reviewed the report of Dr. Ennis, remarking that most of Dr. Ennis's determinations were "on target." (AR 602). Dr. Winston attempted to address the question why plaintiff could not perform any type of work. His answer was: "To this I have no best answer. Clearly and historically, discogenic pain resolves or improves over time as the disc degenerates. One generally is not incapacitated from all activities due to disc disease. It certainly can be a problem, can cause spasm and can limit physical activity. What one tends to forget as a physician is that pain is a biopsychosocial phenomenon where anatomy does not necessarily create pathology. There is clearly more to this picture than simply a broken disc." (AR 602). The doctor complained that the "rug has been pulled out from this gentleman" by the insurance company, which made no sense to the doctor, as "essentially nothing has changed." (AR 603).

       24.     On February 24, 2005, Broadspire submitted plaintiff's file to Dr. Ira Posner, an orthopedic surgeon, for a second record-based medical review. Dr. Posner issued a four-page report dated March 4, 2005. (AR 731-34). After summarizing the records he reviewed, Dr. Posner concluded that plaintiff suffered from a chronic non-malignant pain syndrome, which could be

treated with opioid therapy.  He determined that plaintiff was nevertheless capable of sustaining

work activity at the light duty level (AR 734), without noting any of the nonexertional impairments

imposed by all the previous doctors, including those hired by the insurance company.  Dr. Posner

opined that the "current documentation does not support an impairment that would preclude this

individual from returning to sustained work activity at the [sic] any occupation level."  (AR 734).

        25.    Dr. Posner issued an amendment to his report dated March 14, 2005.  (AR

751-52).  The amended report was issued to take into account Dr. Winston's findings, which Posner

had not seen at the time he issued his first report.  Review of Dr. Winston's report caused Dr. Posner

to reevaluate his conclusion to a significant extent.  After reviewing the Winston report, Dr. Posner

concluded that plaintiff did not have any significant functional or neurological deficit "that would

prevent him from returning to sustained work activity at the *sedentary* level." (AR 752, emphasis

added).  Thus, Dr. Posner's amended report reduced plaintiff's residual functional capacity from the

light to the sedentary level.

        26.    On March 29, 2005, Julia Bell of Broadspire transmitted to Highmark an

appeal summary that included all of the medical information and evaluations in plaintiff's file.  Ms.

Bell provided a three-page summary of the attachments.  (AR 611-14).  Significantly, her summary

of Dr. Posner's amended report incorrectly indicated that the doctor opined that there was

insufficient medical evidence to support a functional impairment that would prevent plaintiff from

performing the material and substantial duties of "any occupation."  (AR 614).  As noted in the

preceding paragraph, Dr. Posner limited plaintiff to sedentary work.

        27.    On April 22, 2005, Jeffrey McLaughlin, a business staff analyst of Highmark

Insurance, sent Julia Bell a brief e-mail.  (AR 610).  The e-mail indicated that McLaughlin had

-18-

reviewed plaintiff's appeal.[5]  Mr. McLaughlin's e-mail reflected his conclusion that there was no objective evidence to suggest that petitioner "is unable to return to the workplace in a sedentary to light duty capacity as of November 1, 2004." (*Id.*).  McLaughlin only addressed the question of plaintiff's medical condition and did not mention the question whether there were jobs available which the plaintiff's medical condition would allow him to perform and which would pay 80% of his predisability income, as required by the Group Policy.

       28.     Highmark did not send any notice to plaintiff of its decision.  Instead, by letter dated April 22, 2005, Julia Bell of Broadspire advised plaintiff that "Highmark Life Insurance Company's Appeal Committee" has found that the submitted documentation did not contain evidence to support his claim for disability.  (AR 607-08).  The letter went on to say that the medical data presented did not substantiate significant impairments in functioning that would have prevented [plaintiff] from performing "the material and substantial duties of any occupation." (AR 608).  The letter concluded with the following statements: "[T]he original decision to deny your Short Term [sic] Disability benefits, effective 11/1/04, has been upheld. . . .  You have now exhausted all mandatory procedures under your employer's STD [sic] plan. . . ." (*Id.*).  This determination ended plaintiff's administrative appeal rights.

---

[5] Defendant's brief represents to the court that some sort of appeal committee reviewed plaintiff's appeal.  (Def. Brief, docket # 19, at 9).  The record is devoid of any indication of the composition of the committee, or even of its existence.  Counsel's representation to the court is at odds with the McLaughlin e-mail, which clearly indicates that he made the decision alone.

## Discussion

### I.        Standard of Review

At the outset, the court must determine whether an "arbitrary and capricious" or a *"de novo"* standard of review applies to the decision to terminate plaintiff's long-term disability benefits.[6]  The *de novo* standard of review is the general rule, and the arbitrary and capricious standard of review is the exception.  A plan administrator's denial of benefits under an ERISA plan is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (*en banc*). The Sixth Circuit "has read *Firestone v. Bruch* to hold that discretion is the exception, not the rule and that the arbitrary and capricious standard does not apply unless there is a *clear* grant of discretion to determine benefits or interpret the plan." *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994) (emphasis in original); *see Anderson v. Great West Life Assur. Co.*, 942 F.2d 392, 395 (6th Cir. 1991).  The party claiming entitlement to review under an arbitrary and capricious standard therefore has the burden of proving that the standard applies.  *See, e.g., Brooking v. Hartford Life & Acc. Ins. Co.*, 167 F. App'x 544, 547(6th Cir. 2006); *Banner v. Trustmark Ins. Co.*, No. C2-04-1099, __ F. Supp. 2d __, 2006 WL 745187, at *7 (S.D. Ohio Mar. 21, 2006).  While no particular language is necessary to vest the plan

---

[6] "Traditional summary judgment concepts are inapposite to the adjudication of an ERISA action for benefits, brought under 29 U.S.C. § 1132(a)(1)(B), because the district court is limited to the evidence before the plan administrator at the time of its decision, and therefore, the court does not adjudicate an ERISA action as it would other federal civil litigation." *Buchanan v. Aetna Life Ins. Co.*, 179 F. App'x 304, 306 (6th Cir. 2006); *see Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 617-19 (6th Cir. 1998).

administrator with discretion to interpret the plan or make benefit determinations, the Sixth Circuit

"has consistently required that a plan contain 'a *clear* grant of discretion [to the administrator] to

determine benefits or interpret the plan.'" *Perez*, 150 F.3d at 555 (quoting *Wulf*, 26 F.3d at 1373)

(italics and alteration in original)); *see Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801,

807 (6th Cir. 2002).

    Defendant argues that the court's review of the decision to terminate plaintiff's long-

term disability benefits should be reviewed under the arbitrary and capricious standard because the

terms of the policy provided Highmark with discretion.  The Group Policy states, in pertinent part,

as follows:

> [W]e have the full and exclusive authority to administer claims and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy.
>
> Our authority includes, but is not limited to, the following:
>
> 1. The right to resolve all matters when a review has been requested.
> 2. The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it.
> 3. The right to determine (a) your eligibility for insurance, (b) your entitlement to benefits, and (c) the amount of the benefits payable to you.

(Group Policy, Part 14, A.R. 365).  The face page of the Group Policy defines "we," "us" and "our"

as the insurance company.  (AR 345).  Courts have consistently interpreted this or substantially

similar policy language as providing discretionary authority and have applied the "arbitrary and

capricious" standard to the administrator's determination. *See McKeehan v. Cigna Life Ins. Co.*, 344

F.3d 789, 792 (8th Cir. 2003); *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 943 (9th Cir. 1999);

*McCready v. Standard Life Ins. Co.*, 417 F. Supp. 2d 684, 696 (D. Md. 2006); *Campos-Holmer v.*

*Standard Life Ins. Co.*, 370 F. Supp. 2d 912, 915-16 (W.D. Mo. 2005).

If Highmark had actually made the decision to terminate plaintiff's benefits, Highmark would be entitled to this deferential standard of review.  Here, however,  Highmark delegated that decision to Broadspire Services, Inc.  The delegation was apparently unwritten and informal, as the record is devoid of any contract or other document establishing the authority of Broadspire.  The factual record points inescapably, however, to the conclusion that Broadspire and not Highmark made the decision to terminate plaintiff's benefits.  All of the investigatory work leading up to the issuance of the October 19, 2004 termination letter (AR 445-47) was done by Broadspire or its contractors.  The letter itself was on Broadspire stationery and was signed by Shirley Heera, a Broadspire disability claims specialist.  The record reflects no input, or even knowledge, by Highmark predating the issuance of the termination letter.  The letter was not tentative nor was it made contingent on the approval of Highmark. [7]  The termination letter announced that benefits would cease two weeks later.  (AR 447).  Benefits ceased as of October 31, 2004, and were never reinstated.  Broadspire clearly made the decision to terminate.  The record indicates that Highmark became involved only months later, in response to plaintiff's appeal, after the termination decision was already made and implemented.

This court therefore finds as a fact that Broadspire, and not defendant Highmark, terminated plaintiff's LTD benefits by letter dated October 19, 2004.  Highmark's mere delegation of decision-making authority, however, does not in and of itself rob it of the benefits of the arbitrary and capricious standard.  "[W]here a named fiduciary with discretionary authority 'properly

_____

[7] This is not a situation where the plan administrator delegated authority to another company to make an initial recommendation, the recommendation was subsequently accepted by the administrator, and the administrator then informed the participant. *See, e.g., Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 826 (2003).

-22-

designates another fiduciary,' then discretionary review 'applies to the designated ERISA fiduciary as well as to the named fiduciary.'" *Lee v. MBNA Long Term Disability & Benefit Plan*, 136 F. App'x 734, 742 (6th Cir. 2005) (quoting *Madden v. ITT Long Term Disability Plan*, 914 F.3d 1279, 1283 (9th Cir. 1990)).[8] ERISA itself establishes the requirements for a proper delegation. 29 U.S.C. § 1105(c)(1) (plan may "expressly" provide for delegation). The terms of the plan are therefore the key to determining whether there has been a "proper" designation. If the plan authorizes delegation by the fiduciary with discretionary authority, the delegation is proper and delegee receives the benefit of the deferential arbitrary and capricious standard. *Lee v. MBNA*, 136 F. App'x at 742. If the plan does not authorize such delegation, only then does the court apply a *de novo* standard of review to the delegee's determination. *See Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 597 (6th Cir. 2001) (The *de novo* standard is "the standard of review applicable to a decision to revoke benefits when that decision is made by a body other than the one authorized by the procedures set forth in the benefits plan."); *see also Rubio v. Chock Full O'Nuts Corp.*, 254 F. Supp 2d 413, 423-25 (S.D.N.Y. 2003).

The Group Policy does not contain provisions authorizing Highmark's delegation of authority to Broadspire. In fact, the Policy is completely silent on the issue and contains no provision remotely satisfying ERISA's requirement of an "express" delegation. Highmark nevertheless argues that a general provision of the policy, which empowers the insurance company to "establish rules and procedures for the administration of the Group Policy and any claim under it" (Group Policy, Part 14(2), AR 365), is sufficient to authorize delegation. (Def. Brief at 11, docket

---

[8]"It is well established" that an ERISA fiduciary may delegate its fiduciary responsibilities to other another named fiduciary or a third party if the plan establishes procedures for such delegation." *Lee v. MBNA*, 136 F. App'x at 742 (citing 29 U.S.C. § 1105(c)(1)).

# 19).  Defendant's argument is foreclosed by the Sixth Circuit's decision in *Wulf v. Quatum Chemical Corp.*, 26 F.3d 1368 (6th Cir. 1994).[9]  In *Wulf*, the court decided that a plan provision giving the committee power to "establish rules for the administration of the Plan" was insufficient to give the committee discretionary authority sufficient to invoke the arbitrary and capricious standard.  26 F.3d at 1372-74.  By fair extension, such vague and general language cannot be deemed an "express" delegation of authority to a third party, when the concept of delegation is not even mentioned in the plan.

The Sixth Circuit's decision in *Lee v. MBNA Long Term Disability & Benefit Plan*, 136 F. App'x 734 (6th Cir. 2005), is instructive.  In *Lee*, plaintiff argued that review should be *de novo*, because of an improper delegation of decisionmaking authority.  The court began its analysis by affirming the principle that an ERISA fiduciary "may delegate its fiduciary responsibilities to another named fiduciary or a third party *if the plan establishes procedures for such delegation.*"  136 F. App'x at 741 (emphasis added) (citing 29 U.S.C. § 1105(c)(1)).  Turning to the Summary Plan Description (SPD), the court found a provision expressly allowing the plan administrator to delegate "discretionary authority" to claims administrators and other persons.  The court found this language sufficient to satisfy the requirements of 29 U.S.C. § 1105(c)(1).  "[W]hat is required is, if delegation is desired, that the instrument provide for the delegation procedures."  136 F. App'x at 742.  The court therefore held that the delegation was proper and that the plan administrator did not forfeit the benefit of the arbitrary and capricious standard established elsewhere in the plan.  The court

---

[9] Because the plan is governed by ERISA, the court applies federal common law rules of contract interpretation.  *See Perez*, 150 F.3d at 556.

-24-

distinguished *Rubio v. Chock Full O'Nuts Corp.*, 254 F. Supp. 2d 413 (S.D.N.Y. 2003), on the ground that the plan in *Rubio* did not expressly allow for delegation.  136 F. App'x at 742.

The foregoing authorities, including *Lee*, clearly require that a proper delegation of authority under an ERISA plan be express in the plan document; the consequence of an improper delegation is the loss of the benefit of the "arbitrary and capricious" standard for review of decisions made by an unauthorized delegate.  Thus, Broadspire's decision terminating plaintiff's LTD benefits must be reviewed under a *de novo* standard.  "When a court reviews a decision *de novo*, it simply decides whether or not it agrees with the decision under review."  *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990).  The *de novo* standard of review applies to both the factual determinations and legal conclusions under review.  *See Wilkins*, 150 F.3d at 613; *Rowan v. UNUM Life Ins. Co.*, 119 F.3d 433, 435 (6th Cir. 1997).  Under the *de novo* standard, this court reviews the decision "without deference to the decision or any presumption of correctness."  *Perry*, 900 F.2d at 966.  "When conducting a *de novo* review, the district court must take a 'fresh look' at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator."  *Wilkins*, 150 F.3d at 616; *see Smith v. UNUM Life Ins. Co. of Am.*, 305 F.3d 789, 794 (8th Cir. 2002) ("A reviewing court may consider both the quantity and quality of the evidence before a plan administrator.").  The administrative record includes documentation submitted during the appeals process.  *Kalish v. Liberty Mut./Liberty Life Assurance Co.*, 419 F.3d 501, 511 (6th Cir. 2005).

II.     *De Novo* Review of Decision

By letter dated April 2, 2003, Highmark informed plaintiff that he met the requirements of the Group Policy for residual disability applicable after the first twenty-four months of disability.  (AR 510-11).  The relevant provision of the Group Policy provides as follows:

> 2.     You are Residually Disabled after the first 24 months of the Maximum Benefit Period if you are working in your own occupation or any other occupation or specialty, and you are currently unable, as a result of your sickness, accidental bodily injury, or pregnancy, to earn more than 80% of your Indexed Predisability Earnings from work in that occupation or any other occupation for which you are reasonably fitted by education, training, and experience.

(AR 356).  Highmark's April 2, 2003 letter determined that, although plaintiff was capable of some work, his disability did not allow him to earn 80% of his indexed predisability earnings.  (AR 511).  In terminating plaintiff's LTD benefits on October 19, 2004, Broadspire determined that plaintiff was able to perform light to sedentary work activity and that, taking into account his physical abilities and transferable skills, there were jobs available to him that would allow him to earn more than 80% of his indexed predisability earnings.  (AR 445-47).

The provisions of the Group Policy concerning residual disability, as interpreted by the insurance company itself, therefore require two separate inquiries.  First, a medical determination must be made concerning the extent of the claimant's disabilities and the functional capacity that the claimant retains in light of those disabilities.  This conclusion is generally stated both in terms of exertional capacity (*i.e.*, the claimant is capable of heavy, medium, light, or sedentary lifting requirements) and nonexertional restrictions (*e.g.*, claimant must not stoop or bend, must not be exposed to irritating fumes or other irritants, or cannot operate or work near heavy machinery).  Once this medical determination has been made, the second question is vocational in nature: taking into

-26-

account the claimant's functional capacity, along with his age, work experience, transferable skills and other relevant factors, are there jobs reasonably available to him that would allow him to earn more than 80% of his indexed predisability earnings?  In the present case, Broadspire made findings on both issues.  On the medical question, Broadspire determined that plaintiff had the functional capacity to perform sedentary to light work, with certain nonexertional restrictions.   On the vocational issue, Broadspire determined (on the basis of the Employability Assessment Report by Rene Teper) that plaintiff's physical abilities and transferable skills suited him to perform three supervisor jobs, each of which paid over $23,000.00 per year.  (AR 445-47).  When Highmark reviewed plaintiff's appeal, Highmark concluded on the medical issue that plaintiff was able to return to the workplace "in a sedentary to light duty capacity as of November 1, 2004."  (AR 610). Highmark did not identify any occupation for which plaintiff was reasonably fitted by education, training, and experience or examine wages that plaintiff could earn.  (AR 607-08, 610).

Both the medical determination and vocational decision are subject to this court's *de novo* review.

A.    Medical Determination

Both Broadspire and Highmark determined that plaintiff was able to perform work in the sedentary to light range, with nonexertional restrictions imposed by their own consultants. The nonexertional restrictions reflected in the record included a sit/stand option every hour as needed, as reported by Dr. Giersch (AR 181), and more extensive restrictions noted in the Functional Assessment Report done by NovaCare Rehabilitation: plaintiff could sit for 25 to 30 minutes at a time for a total of three hours per day; he could stand for 5 to 15 minutes at a time, for a total of one

hour; he could occasionally walk short distances, for a total of two to three hours per day, but could never crawl or kneel, bend or stoop, climb stairs and could lift small weights only occasionally. (AR 199-206). In other words, the insurance company concluded, on the basis of the medical and other assessments in the file, that plaintiff's medical condition allowed him to perform a *limited* range of sedentary to light work.

Plaintiff challenges this conclusion, contending that he is totally disabled and therefore cannot perform work of any kind. On *de novo* review of this question, the court is to take into account all of the medical evidence, giving each doctor's opinion weight in accordance with the supporting medical tests and objective findings that underlie the opinion. In reviewing the medical evidence in an ERISA case, the court is not to apply the "treating physician rule" applicable in Social Security cases, in which the opinion of treating physicians is entitled to more weight than that of non-treaters, and the agency is required to give good reasons for the failure to give dispositive weight to the opinion of the treating physician. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003); *compare Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

After reviewing all the medical evidence, the court concludes that Broadspire's and Highmark's medical determinations were adequately supported. After two physical examinations, one done in November 2000 and the other in December 2002, Dr. Giersch concluded that plaintiff was capable of lifting in the light category of work, but that he could not perform a full range of light work, because of certain nonexertional restrictions, such as a sit/stand option and restrictions against crawling, climbing a ladder, and the like. (AR 181, 423). The record review by Dr. Ennis in August 2004 confirmed that plaintiff's spinal condition disabled him from prolonged heavy lifting, climbing, or repetitive bending and stooping. (AR 441). Dr. Winston, a treating physician, examined plaintiff

-28-

in January 2005 and submitted a report commenting that the conclusions of Dr. Ennis were "on target." (AR 602). Although Dr. Winston quarreled with the wisdom of the insurance company's decision to terminate benefits, he did not offer any substantive findings or opinions that would undermine the opinions of defendants' consulting physicians. After reviewing Dr. Winston's findings, Dr. Posner, also a consultant of the insurance company, determined that plaintiff could work at the sedentary level (AR 752), the lowest exertional level defined by the Department of Labor. The last report of Dr. Holman, plaintiff's treating physician, contained findings consistent with the foregoing evaluations. Dr. Holman indicated that plaintiff was able to lift, carry, push and pull at the sedentary level, but he should never crouch, squat, kneel or crawl and that he was able to perform other work activities either occasionally or frequently. (AR 626). Thus, the objective findings of all the doctors tend to support the conclusion that plaintiff is capable of sedentary work or a very limited range of light work.

Plaintiff nevertheless argues that defendant and Broadspire improperly dismissed the opinion of the treating physicians that plaintiff was totally disabled. As noted above, the only contemporaneous medical reports presented by plaintiff's treating physicians were the March 16, 2004 report from Dr. Holman and the January 31, 2005 report from Dr. Winston, submitted during the appeal period. Dr. Holman made objective findings consistent with the conclusion that plaintiff was capable of performing work at the sedentary exertion level. Nevertheless, Dr. Holman presented the opinion that plaintiff was unable to return to any type of work. Such a bare opinion, unsupported by objective medical findings and in conflict with the doctor's own conclusions concerning a patient's exertional capabilities, is not entitled to significant weight. A treating physician's conclusory statement that a patient is disabled is not entitled to deference in ERISA review, *see Lucy*

-29-

*v. Macsteel Service Center Short-Term Disability Plan*, 107 F. App'x 318, 321 (4th Cir. 2004), nor is a plan administrator required to defer to the opinion of a treating physician that is inconsistent with the physician's own treatment records and objective findings. *See Creech v. UNUM Life Ins. Co. of N. Am.*, 162 F. App'x 445, 454 (6th Cir. 2006) (treater's failure to support his opinion with data or useful analysis sufficient to discount opinion); *Karr v. Metropolitan Life Ins. Co.*, 142 F. App'x 932, 933-34 (8th Cir. 2005).   Even under the much more lenient "treating physician rule," the conclusion of "total disability" by a treating physician is not entitled to credence where it conflicts with his other findings or is unsupported by objective medical data.   *See Jones v. Commissioner of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). By contrast, Dr. Winston's final opinion agreed in most part with the observations of Dr. Ennis.  In the "Impressions" section of his report, Dr. Winston did not state a clear opinion of disability, but rather expressed frustration at the decision of the insurance company and puzzlement at the source of plaintiff's back pain, which the doctor clearly expected should have been resolved by that time. Nothing in Dr. Winston's report conflicts with the conclusion that plaintiff remains capable of performing at least sedentary work.

In conclusion, upon *de novo* review of the medical evidence, the court determines that plaintiff remains capable of performing a very limited range of light work or sedentary work, with appropriate nonexertional restrictions as delineated by the treating and nontreating physicians.

### B.   Vocational Determination

The second issue under the Group Policy's definition of residual disability is vocational in nature: whether, in light of a claimant's medical restrictions, transferable skills and

work experience, jobs are reasonably available that would allow him to earn more than 80% of his indexed predisability earnings.  In defendant's view, this vocational determination is a central issue in the case: "The only question is whether the plaintiff was capable of earning at least 80% of his pre-disability income."  (Def. Brief, docket # 19, at 16).  When Broadspire made the decision to terminate plaintiff's benefits, it answered this vocational question by relying on the Employability Assessment Report of Rene Teper, who identified three supervisor jobs at the light exertional level, each of which paid over $23.00 per hour.  (AR 408).  Broadspire's letter of termination specifically listed the three jobs identified by Teper (AR 446), finding that these jobs were available in plaintiff's geographical area and "are in keeping with your transferable skills and physical abilities as outlined by the Functional Capacity Evaluation, the salary required by your policy and the information provided by your provider."  (AR 447).  In its appellate decision, Highmark ignored the vocational issue altogether.  Upon *de novo* review, the court concludes that both determinations are seriously flawed and are unsupportable.

The Sixth Circuit has consistently held that a plan administrator responsible for terminating benefits under this type of long-term disability policy must (1) identify the type of jobs that the administrator believes plaintiff is capable of performing; and (2) make a sufficient inquiry into whether the jobs it has identified are jobs the claimant can reasonably perform in light of the claimant's specific functional limitations.[10]  *See Brooking v. Hartford Life & Accident Ins. Co.*, 167

_____

[10] The Third Circuit's recent decision in *Havens v. Continental Cas. Co.*, No. 05-3075, 2006 WL 1648602 (3d Cir. June 13, 2006) is instructive.  The court observed that the determinations of the claimant's functional capacity and the occupation's requirements "must together be detailed enough to make a rational comparison possible.  Otherwise, the 'finding' that the claimant can perform alternate occupations consists only of a bald assertion."  *Id.*, at * 6.  While it is  appropriate to engage a vocational consultant to help identify occupations that the individual might be capable of performing, a consultant's report that merely mentions a few general factors and then lists a few

F. App'x 544, 549 (6th Cir. 2006) (Hartford's decision terminating disability benefits was arbitrary and capricious because the sedentary jobs Hartford had identified were not jobs that the claimant could reasonably perform in light of her specific disabilities.); *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (The administrator's decision was arbitrary and capricious because it terminated benefits without specifying the kind of work the claimant was capable of performing.); *accord Glenn v. Met Life*, No. 05-3918, 2006 WL 2519293, at * 13 (6th Cir. Sept. 1, 2006) (Administrator's termination of long-term disability benefits was found arbitrary and capricious where, among other things, the administrator's occupational skills analyst was provided with an inappropriately selective portion of the claimant's medical records.); *Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 362 (6th Cir. 2002) (The decision terminating long-term disability benefits was arbitrary and capricious because the insurance company had provided its vocational consultant with a "cherry-picked" medical record that did not accurately reflect the plaintiff's functional limitations, and the resulting report from the vocational consultant could not support the termination of benefits because it was an "incomplete and inaccurate representation of [the plaintiff's] ability to work."); *Greencup v. Hartford Life & Accident Ins. Co.*, No. 5:05-cv-105-R, 2006 WL 1133570, at * 3 (W.D. Ky. Apr. 26, 2006) ("[A] plan administrator not only must specify what kind of work a claimant could perform, but must also 'make some inquiry into whether the jobs selected are ones that the claimant can perform in light of specific disabilities.'") (quoting *Brooking*, 167 F. App'x at 549). The lynchpin of Broadspire's October 19, 2004 decision to terminate plaintiff's benefits was the June 14, 2004 "Employability Assessment Report" by Broadspire's

---

jobs is inadequate. *Id.* "[I]t is not rational to defer to such experts in the absence of the threshold indication that their conclusions, in the words of Federal Rule of Evidence 702, are the product of 'reliable principles and methods . . . applied . . . reliably to the facts of the case.'" *Id.*, at * 6.

Vocational Care Manager Rene Teper.  Upon review, the court finds Teper's report fails to provide sufficient evidentiary support Broadspire's decision to terminate plaintiff's disability benefits, because the report was not consistent with plaintiff's functional limitations, and the report failed to provide an adequate analysis of how plaintiff would be able to perform the three occupations identified in light of plaintiff's education and specific functional limitations.

The second page of the report contains a four-sentence discussion of plaintiff's education.  Plaintiff completed 8th grade in school and obtained a prison GED.  (AR 406).  The report offered no analysis of how this level of education qualified plaintiff for the three listed occupations.  Two paragraphs of the report were devoted to plaintiff's employment history and skills.  (AR 406).  The most critical skills identified were the skills related to plaintiff's previous employment  as lumberyard foreman: managing a lumberyard, checking loads, supervising up to 7 employees, helping customers, strapping, checking, banding, and identifying loads, driving a fork-lift and dump truck, and completing invoices on a computer.  Teper's report did not contain any discussion of the insurance company's own determinations, made in the year 2000, that plaintiff was disabled precisely because he could not perform the requirements of the lumberyard foreman occupation.

The report made only passing references to plaintiff's "medical history of being legally blind in his left eye" (AR 406) and "taking OxyContin, 80 mg. 3 times per day,[11] Celebrex

---

[11]"OxyContin is an opioid agonist and a Schedule II Controlled Substance with an abuse liability similar to morphine."  Recognized side-effects from this medication are "typical opioid side effects," including dizziness and somnolence.  PHYSICIAN'S DESK REFERENCE, 2818, 2821 (59th ed. 2005).  Plaintiff's regular use of such strong prescription medication warranted at least some discussion in an analysis of plaintiff's "employability."   This type of analysis would appear particularly appropriate given the apparent risk of potentially serious injury posed by proximity to machinery and/or materials in all three occupations Broadspire listed.

200 mg., and medication for his high blood pressure." (AR 406).  It offered no analysis of how plaintiff's limited vison and the potential side-effects from his medication may have adversely impacted plaintiff's "employability."   Teper stated that the "Work restrictions of Light work, according to the FCE dated 4/16/04, [would] be utilized for the purpose of this assessment, as advised by the claims examiner." (AR 406). "Based on the physical capacities advised by the FCE," Teper assumed that plaintiff would be "capable of performing Light work for an 8 hour day." (AR 408). "This criterial [sic] was combined with his work history and educational level to identify alternate occupations within his current work restrictions." (AR 408).  The report identified three occupations ((1) Yard Supervisor, (2) Supervisor, Wood Crew, and (3) Supervisor, Machining) that were classified as light in their physical strength requirements by the Dictionary of Occupational Titles (DOT), and that Teper believed would pay an estimated hourly wage in excess of the target wage of $19.83 per hour.[12] (AR 408).  The report's superficial "analysis" with regard to these three occupations listed cannot withstand scrutiny.

In basing his analysis on the simple assumption that plaintiff could do work at the light exertional level, Teper completely ignored plaintiff's nonexertional limitations.  No physician, whether employed by plaintiff or defendants, certified plaintiff for a full range of light work.  In addition, the NovaCare Rehabilitation functional assessment, performed at Broadspire's request, identified numerous nonexertional restrictions. (AR 199-206). The very DOT job descriptions cited by Teper set forth a list of nonexertional requirements for each supervisory position.  Notably absent

_____

[12] Teper's report stated, "It will be important to target occupations with earnings of $19.83 hourly" because a "claims examiner" had indicated that "the Disability Plan/Policy requires 80% of the preindexed disability earning which is $3,436 monthly or $19.83. hourly."  (AR 408).

-34-

from Teper's report was any discussion of the non-strength components of the DOT's definitions.[13]

The DOT defines the General Educational Development (GED) requirements for a Yard Supervisor[14]

---

[13] As a matter of convenience, non-strength physical aspects of occupations such as postural limitations, visual acuity, etc., and environmental conditions are sometimes referred to as part of the DOT definition. These occupational requirements, however, actually appear in a companion publication from the United States Department of Labor, Employment and Training Administration entitled the SELECTED CHARACTERISTICS OF OCCUPATIONS DEFINED IN THE DICTIONARY OF OCCUPATIONAL TITLES ("SC") (1993), which provides additional information with regard to every occupation listed in the DOT. *See Carlson v. Barnhart*, 140 F. App'x 29, 37 (10th Cir. 2005); *Williams v. Barnhart*, 424 F. Supp. 2d 796, 800 n.9 (E.D. Pa. 2006); *see also Use of Vocational Expert & Vocational Specialist Evidence & Other Reliable Occupational Information in Disability Decisions*, SSR 00-4p (reprinted at 2000 WL 1898704, at *1 (S.S.A. Dec. 4, 2000)) (ALJs are required to identify and obtain a reasonable explanation for any conflicts between the occupational evidence provided by vocational experts and the "information in the DICTIONARY OF OCCUPATIONAL TITLES (DOT), including its companion publication, the SELECTED CHARACTERISTICS OF OCCUPATIONS DEFINED IN THE REVISED DICTIONARY OF OCCUPATIONAL TITLES (SCO), published by the Department of Labor" and provide an explanation of how the conflict was identified and resolved.). The DOT and SC are considered together in evaluating the demands of an occupation. *See Preslar v. Secretary of Health & Human Servs.*, 14 F. 3d 1107, 1113 n. 2 (6th Cir, 1994); *see also King v. Chater*, No. 96-55012, 1997 WL 330838, at * 2 (9th Cir. June 16, 1997) ("The Commissioner routinely relies on these publications in determining the skill level of a claimant's past work, and in evaluating whether the claimant is able to perform other work in the national economy.") Even if Teper had not cited the DOT as part of its basis for denying plaintiff's claim, it would nonetheless have been appropriate for this court to take judicial notice of the DOT and SC in this ERISA context. *See Evans v. Metropolitan Life Ins. Co.*, Nos. 05-5791, 05-6327, 2006 WL 1827704, at * 6 n.7 (6th Cir. June 29, 2006).

[14] The DOT defines Yard Supervisor duties as follows: "Supervises and coordinates activities of workers engaged in unloading, storing and distributing materials, such as coal, logs, lumber, wastepaper, and sulfur in yard of industrial plant: Confers with plant personnel and plans and allocates use of materials handling equipment, such as conveyors, cranes, tractors, and trucks, according to material to be moved and production requirements. Directs workers engaged in keeping records of materials received and used. Trains new workers. May inspect incoming materials and verify invoices. May inspect machines and equipment and direct workers engaged in maintenance and repair work. May supervise workers engaged in drying lumber in kiln [KILN OPERATOR (woodworking) 563.382-010]. May supervise workers engaged in booming (gathering) and sorting logs in a log pond. Performs other duties as described under SUPERVISOR (any industry) Master Title." The Occupational Code for Yard Supervisor is 929.133-010 (woodworking) and the applicable Guide for Occupational Exploration Code (GOE) is 05.12.01. DOT at 948.

as level 4 reasoning development,[15] level 3 mathematical development,[16] and level 3 language

development.[17]  The Specific Vocational Preparation (SVP) required is level 7, meaning "over 2

years up to and including 4 years."[18]  *See* DOT, Appendix C.  It is not clear from the report how

plaintiff's level of mental functioning and occupational background would qualify him for the Yard

Supervisor occupation.  Moreover, the Yard Supervisor occupation requires  "frequent" handling,

reaching, fingering, talking, hearing, near vision acuity, and depth perception, and "occasional"

stooping, crouching, far vision acuity, accommodation, color vision, field of vision, requirements

at odds with the doctor's prohibitions against all stooping and crouching and plaintiff's blindness

in one eye.  The Yard Supervisor position entails "frequent" exposure to weather and "loud" noise

---

[15] The DOT states that level 4 reasoning development is composed of these elements: "Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists.  Interpret a variety of instructions furnished in written, oral diagrammatic, or schedule form."  DOT, Appendix C.

[16] Level 3 mathematical development requires "shop math" involving "comput[ing] discount, interest, profit and loss commission, markup and selling price; ratio and proportion, and percentage" and "calculat[ing] surfaces, volumes, weights and measures."  The ability to perform algebra and geometry are also required.  The algebra component consists of calculating variables and formulas, monomials and polynomials, ratio and proportion variables, and square roots and radicals.  The geometry component consists of calculating plane and solid figures, circumference, area and volume, and understanding kinds of angles and properties of pairs of angles."  DOT, Appendix C.

[17] Language Development consists of three components:  reading, writing and speaking. Level 3 language development consists of the following: "Reading: Read a variety of novels, magazines, atlases, and encyclopedias.  Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work. Writing: Write reports and essays in proper format, punctuation, spelling, grammar, using all parts of speech.  Speaking: Speak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice."  DOT, Appendix C.

[18] Teper's report stated, "Several occupations were identified as an 'Excellent' or 'Good' level of transferability.  Occupations identified at these levels may only require minimal training or familiarization."  (AR 408).  Bare conclusions are not a substitute for analysis.

intensity.  SC at 122.  Teper's report failed to address any nonexertional physical requirements or environmental conditions specifically applicable to the Yard Supervisor occupation, much less analyze them to determine whether they were consistent with plaintiff's specific functional limitations.

The report contained a cursory discussion of wage estimates.  Page 4 of the report stated indicated that Yard Supervisor fell within the Standard Occupational Classification (SOC)[19] for "First-Line Supervisors/Managers of Transportation and Material-Moving Machine and Vehicle Operators."  The report made no attempt to address the non-wage facets of this Department of Labor classification.[20]  For example, occupations within this classification fall within job zone three, indicating that they require "medium preparation."  Previous work-related skill, knowledge, or experience is required for these occupations.  These occupations usually involve using communication and organizational skills to coordinate, supervise, manage, or train others to accomplish goals.  Employees in these occupations usually need one or two years of training involving both on-the-job experience and informal training with experienced workers.  Most

_____

[19] The Standard Occupational Classification (SOC) system provides the occupational title and code utilized in the Department of Labor's electronic Occupational Information Network (O*NET) system.  "The O*NET system, using common language and terminology to describe occupational requirements, supercedes the seventy-year old *Dictionary of Occupational Titles* with current information that can be accessed online or through a variety of public and private sector career and labor market information systems." http://www.doleta.gov/programs/onet/; *see Gilcrest v. UNUM Life Ins. Co. of Am.*, No. 05-CV-923, 2006 WL 183057, at * 3 n.4 (S.D. Ohio June 30, 2006); *Troy v. UNUM Life Ins. Co. of Am.*, No. 03-Civ.-9975(CSH), 2006 WL 846355, at * 9 (S.D.N.Y. Mar. 31, 2006).

[20] The First-Line Supervisors/Managers of Transportation and Material-Moving Machine and Vehicle Operators" classification, 53-1031.00, contains an extensive list of other specific requirements that is too lengthy to reproduce herein, but is incorporated by reference.  *See* http://online.onetcenter.org/link/summary/53-1031.00.

occupations in this zone require training in vocational schools, related on-the-job experience, or an associate's degree. Some jobs may require a bachelor's degree. It is patently unreasonable to conclude that plaintiff, who had an eighth-grade education and a prison GED, could meet all these qualifications.

The same deficiencies are apparent in the report's discussion of the Supervisor, Wood Crew[21] and Supervisor, Machining jobs. The DOT states that the General Educational Development requirements for a Supervisor, Wood Crew are level 3 reasoning development,[22] level 2 mathematical development,[23] and level 2 language development.[24] The Specific Vocational Preparation required is level 6, meaning "over 1 year up to and including 2 years." DOT, Appendix

---

[21] The DOT definition of Supervisor, Wood Crew is as follows: "Supervises and coordinates activities of workers engaged in culling, cutting, and loading wood on cars or trucks to be sold for fuel or used at sawmill. Performs duties as described under SUPERVISOR (any industry) Master Title." The Occupational Code for Supervisor, Wood Crew is 669.137-010 (woodworking) and the applicable Guide for Occupational Exploration Code (GOE) is 03.02.02. DOT at 616.

[22] Appendix C of the DOT defines level 3 reasoning development as follows: "Apply commonsense understanding and carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations."

[23] Level 2 mathematical development requires these abilities: "Add, subtract, multiply and divide all units of measure. Perform the four operations with like common and decimal fractions. Compute ratio, rate, and percent. Draw and interpret bar graphs. Perform arithmetic operations involving all American monetary units." DOT, Appendix C.

[24] The reading component of Level 2 language development consists of (1) a passive vocabulary of 5,000 - 6,000 words, reading at a rate of 195 to 215 words per minute, reading adventure stories and comic books, looking up unfamiliar words in a dictionary for meaning, spelling, and pronunciation, and reading instructions for assembling model cars and airplanes. Writing at level 2 consists of writing compound and complex sentences, proper end punctuation, using cursive style, and employing adjectives and adverbs. Speaking clearly and distinctly with appropriate pauses and emphasis, correct pronunciation, variations in word order, and use of present, perfect and future tenses are necessary to satisfy the speaking component of level 2 language development. DOT, Appendix C.

C.  The Supervisor, Wood Crew  position requires "frequent"  reaching, handling, talking, hearing,

and near vision acuity and "frequent" exposure to the weather and noise.  SC at 33.  The Supervisor,

Machining (woodworking)[25] requires level 4 reasoning development, level 3 mathematical

development, and level 3 language development.  Its "level 7" SVP indicates that "over 2 years up

to and including 4 years" of vocational preparation is necessary.  DOT, Appendix C.  The

Supervisor, Machining (woodworking) position requires "frequent" reaching, handling, fingering

talking, hearing, near vision acuity, and depth perception, "occasional" stooping, feeling, and

accommodation, and "occasional" exposure to atmospheric conditions, proximity to moving

mechanical parts, and exposure to toxic or caustic chemicals and high noise levels.  SC at 74.  The

non-strength requirements of these occupations were ignored, the wage estimates provided  were

lacking in evidentiary support, and there was no analysis of the non-wage requirements of

occupations within the classification for "First Line Supervisors/Managers of Production and

Operating Workers."[26]

---

[25] The DOT definition of Supervisor, Machining is:  "Supervises and coordinates activities of wood workers engaged in operating a variety of woodworking machines to shape wooded parts or products by removing excess material: Analyzes work orders to determine production schedules. Computes amounts of stock and supplies required for operations, based on production schedules and requisitions materials from storage area.  Inspects and measures wood products using pattern and rule, to verify conformance to company standards.  Directs workers in adjusting machines and equipment to repair products which fail to meet standards.  Trains new workers in setup and operation of machines.  Performs other duties as described under SUPERVISOR (any industry) Master Title. May plan flow of materials through department and develop physical layout of machines according to work orders.  May layout designs on stock to guide workers in machining operations [PATTERN MAKER (woodworking) I 761.381-022].  May be designated according to department supervised as Supervisor, Finish-End (furniture); Supervisor, Rough-End (furniture) ." The Occupational Code for Supervisor, Machining (woodworking)  is 669.130-022 and the GOE code number is 05.05.08.  DOT at 615.

[26] The Job Zone number assigned to First Line Supervisors/Managers of Production and Operating Workers classification is 3, meaning that a medium level of job preparation is necessary.

-39-

In summary, Teper's report is an inadequate basis upon which to conclude that certain supervisory jobs paying the requisite wage were available to plaintiff.  The report improperly assumed that plaintiff could perform a full range of light work, an assumption at odds with everything in the record.  Teper's report did not utilize plaintiff's specific limitations or make a sufficient inquiry into whether the three occupations it identified were suitable in light of plaintiff's specific nonexertional limitations.  As in *Spangler*, this was an "incomplete and inaccurate" assessment of plaintiff's ability to work.  313 F.3d at 362.

On this basis, the court does not hesitate to conclude that the termination decision of Broadspire on October 19, 2004, was unsupportable.  Although the medical determination (plaintiff could perform a *limited* range of sedentary to light work) was sound, the vocational determination was not.  Teper's report, upon which Broadspire relied completely in this regard, was based on the flawed assumption that plaintiff could perform a *full* range of light work, and it identified jobs that were clearly incompatible with plaintiff's nonexertional restrictions and which required educational and vocational experience that plaintiff did not have.

The appellate determination by Highmark was even more flawed.  By the time of Highmark's decision on April 22, 2005, Highmark's own consultative physician, Dr. Posner, had

---

Previous work-related skill, knowledge, or experience is required for these occupations.  Employees in these occupations usually need one or two years of training involving both on-the-job experience and informal training with experienced workers.  Most occupations in this zone require training in vocational schools, related on-the-job experience, or an associate's degree. Some may require a bachelor's degree.  These jobs require being reliable, responsible, and dependable, and fulfilling obligations, leadership in taking charge and offering opinions and direction, maintaining composure, keeping emotions in check, controlling anger, and avoiding aggressive behavior, even in very difficult situations, accepting criticism and dealing calmly and effectively with high stress situations, attention to detail, persistence in the face of obstacles, integrity, cooperation,  willingness to take on responsibilities and challenges.  *See* http://online.onetcenter.org/link/summary/51-1011.00.

-40-

reduced plaintiff's exertional level to "sedentary." (AR 752). None of the three jobs identified in the Teper report were suitable for a worker restricted to the sedentary level. On this basis alone, the appellate decision must be deemed patently incorrect, as the insurance company had not identified *any* sedentary work that would reasonably allow plaintiff to earn 80% of predisability wages. Furthermore, the Highmark decision violated the requirement of Sixth Circuit jurisprudence that an administrator both identify jobs that the claimant is capable of performing and make a sufficient inquiry into the question whether the claimant can reasonably perform them in light of his specific limitations. *Brooking*, 167 F. App'x at 549. By completely ignoring the vocational issue, Highmark's cursory review failed to satisfy this necessary step. *See McDonald*, 347 F.3d at 172 (decision was arbitrary when it failed to specify the kind of work plaintiff was capable of performing).

         For the foregoing reasons, the court concludes that neither the Broadspire decision nor the appellate decision by Highmark withstands *de novo* review. Even if the court were to apply the more lenient arbitrary and capricious standard, the result must be the same. Under Sixth Circuit law, the court will uphold benefit determination if it is rational in light of the plan provisions. *See Smith v. Continental Cas. Co.*, 450 F.3d 253, 258 (6th Cir. 2006). Broadspire's vocational decision was not rational, because it relied on the Teper report, which incorrectly assumed that plaintiff was capable of a full range of light work and ignored all of his nonexertional limitations. Highmark's appellate decision was irrational for the same reason, and for the added reason that, by the time Highmark reviewed the claim, its own consulting physician had limited plaintiff's exertional level to sedentary. None of the three jobs identified by Teper were at the sedentary exertional level. Furthermore, in performing a review under the arbitrary and capricious standard, the court must take

-41-

into consideration the fact that Highmark and its contractor, Broadspire, were acting under a conflict of interest because they both determined and paid disability claims.  *See Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 292 (6th Cir. 2005).  Under Sixth Circuit authority, the hired plan administrator, as well as the insurance company, labored under this conflict.  *Id.*; *see Glenn v. MetLife*, No. 05-3918, ___ F.3d ___, 2006 WL 2519293, at * 5 (6th Cir. Sept. 1, 2006).  The Sixth Circuit has remarked that where there is a monetary incentive for the insurance company or its claims administrator to deny the claim, "the potential for self-interested decision-making is evident." *University Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n.4 (6th Cir. 2000).  In the present case, there is evidence in the record that the conflict of interest is not merely potential, but actual.  Before beginning the process of reevaluation that led to termination, Highmark identified in an internal memorandum all the reasons that made this a troublesome insurance claim and, as a result, offered plaintiff $40,000.00 to buy out any remaining obligation under the Group Policy.  (AR 72).  This document is evidence that Highmark was, at least in part, concerned with its own monetary exposure and not single-mindedly pursuing the best interests of the participant.  Certainly, no fiduciary with plaintiff's best interests at heart would counsel him to accept $40,000.00 (approximately two years' benefits) in exchange for a release of benefits that could be payable until age 65.  After the insurance company was unable to redeem its liability, it embarked on a rather single-minded campaign of evaluations and re-evaluations patently designed to document a termination of benefits.  Although the existence of a conflict of interest is not dispositive, it is a factor relevant to this court's conclusion that the decision to terminate benefits was arbitrary and capricious.

In summary, the court concludes that the termination decision does not withstand scrutiny under any standard of review.

IV.    Relief

Plaintiff's claim for benefits is brought pursuant to section 502(a)(1)(B) of ERISA, which empowers a participant or beneficiary to sue "to recover benefits due under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The principal relief under this section is an order reinstating benefits and awarding retroactive benefits. *See Glenn*, 2006 WL 2519293, at * 13 (proper remedy is reinstatement of benefits retroactive to date of improper termination). No extra contractual compensatory damages or punitive damages are allowed. *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 215 (2004); *Varhola v. Doe*, 820 F.2d 809, 817 (6th Cir. 1987). The court will therefore order an immediate reinstatement of benefits, beginning with the benefit payable in October 2006.

The court also will enter judgment in favor of plaintiff for benefits retroactive to November 1, 2004, through September 2006. To facilitate the framing of an appropriate judgment, defendant will be directed to file a schedule within fourteen days, setting forth for each month between November 2004 and September 2006, inclusive, the benefit amount payable to plaintiff. In addition, the district court has discretion to award pre-judgment interest in an ERISA case in accordance with general equitable principles. *See Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir. 1998). The court determines that this is an apt case for the award of pre-judgment interest, as plaintiff has been deprived of the use of benefits necessary to support himself and his family for two years, while the insurance company has enjoyed the use of the money during the same period. The purpose of an award of pre-judgment interest in an ERISA case is to compensate the beneficiary for the lost time value of money wrongly withheld from him, a goal that appears eminently

appropriate in this case.  *See Ford*, 154 F.3d at 618.  As federal law does not prescribe a rate for prejudgment interest, the matter is one of trial court discretion.  In this regard, the Sixth Circuit has approved the use of the 52-week Treasury Bill rate prescribed in 28 U.S.C. § 1961 for post-judgment interest as a reasonable guide for the calculation of prejudgment interest as well.  *Id.* at 619; *see Caffey v. UNUM Life Ins. Co.*, 302 F.3d 576, 585 (6th Cir. 2002).

The schedule submitted by defendant therefore shall contain, for each monthly payment, a calculation of pre-judgment interest, using the "stream-of-benefits model" endorsed by the Sixth Circuit in *Caffey*, 302 F.3d at 585.  Under this approach, interest is calculated on each monthly payment of LTD benefits beginning on the date that the payment was due.  *Id.*  Defendant's schedule shall use a blended interest rate of 4.04 percent, which the court has derived by taking the average of all monthly average 1-year constant maturity treasury yields from November 2004 to the present.[27]  *See Caffey*, 302 F.3d at 585; *Ford*, 154 F.3d at 619.  The court's calculation of the blended rate is Attachment 1 to this opinion.  The monthly average 1-year constant maturity treasury yield was gleaned from the website of the Federal Reserve www.federalreserve.gov.  The court derived the blended rate by adding each average monthly rate, as reported by the Federal Reserve Bank, and dividing the sum by the number of months (23).  The blended rate so derived must then be applied

---

[27] The version of 28 U.S.C. § 1961 in effect before December 2000 utilized the average 52-week United States Treasury bill rate.  "Effective December 21, 2000, the statute [28 U.S.C. § 1961] was amended and the language 'the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills submitted immediately prior to' was replaced by 'the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System.'"  *B.F. Goodrich Co. v. Murtha*, No. Civ. 387 CV 52PCD, 2004 WL 3249236, at * 3 (D. Conn. Aug. 24, 2004) (quoting 28 U.S.C. § 1961, comments).  Because plaintiff's benefits were due on a monthly basis and for purposes of convenience, the monthly average figure from the Department of Treasury is utilized.  Use of a weekly average would result in only a minuscule difference.

-44-

to each retroactive monthly payment, beginning on the due date and running through September 2006, without compounding.  Plaintiff is granted seven days after the filing of defendant's schedule in which to lodge objections to either the benefit amounts or the calculation of interest.  After review of the schedule and any objections, the court will enter judgment for past-due benefits.

After the entry of final judgment, plaintiff may apply for costs and attorney's fees, which the court will consider separately as allowed by Rule 54(d)(2) of the Federal Rules of Civil Procedure.  *See Miltimore Sales, Inc. v. International Rectifier, Inc.*, 412 F.3d 685, 687 (6th Cir. 2005).

In his complaint, plaintiff also asks for injunctive relief prohibiting defendant from discontinuing or reducing future LTD benefits.  Although the court has discretion to order equitable relief in an appropriate case, such a prospective order is not warranted on the present record. Plaintiff is a relatively young man, and his medical condition is subject to change, for better or worse, before he attains age 65.  It may be that his back condition will degenerate, or, as suggested by Dr. Winston, the condition may resolve naturally.  Likewise, plaintiff's vocational situation is not static.  It is certainly possible that plaintiff will undergo retraining that will render him employable at a level meeting the salary requirements of the Group Policy.  Or, as suggested by Valerie Smith of Highmark in a September 29, 2003 memo, the insurance company may devise "a vocational rehabilitation plan with him so that he can be gainfully employed at some point," a suggestion that has apparently never been pursued.  (AR 75).  Suffice it to say that the future is dynamic and presently unknowable, and that any decision by the insurance company with regard to future benefits must be judged on the basis of the facts as they then appear.

### Conclusion

For the foregoing reasons, the court concludes that defendants' decision to terminate plaintiff's benefits is not sustainable under any applicable standard of review.  Defendant Highmark Life Insurance Company will be ordered to reinstate plaintiff's benefits under the Group Policy, effective October 2006.  Defendants will also be ordered to file a schedule of past-due benefits, along with the calculation of prejudgment interest comporting with the court's opinion, after which the court will enter final judgment.


Dated:   September 14, 2006               /s/  Joseph G. Scoville
                                          United States Magistrate Judge

-46-